# ORIGINAL

1    DeGuzman.rsp

2    LEONARDO M. RAPADAS
     United States Attorney
3    KARON V. JOHNSON
     Assistant U.S. Attorney
4    Suite 500, Sirena Plaza
     108 Hernan Cortez Avenue
5    Agana, Guam 96910
     Telephone: (671) 472-7332/7283
6    Telecopier: (671) 472-7334

7    Attorneys for United States of America

**FILED**
DISTRICT COURT OF GUAM

AUG 25 2005 ⁹ρ

**MARY L.M. MORAN
CLERK OF COURT**

8

9              IN THE UNITED STATES DISTRICT COURT

10                FOR THE TERRITORY OF GUAM

11   UNITED STATES OF AMERICA,       )    CRIMINAL CASE NO. 00-00052
                                     )
12              Plaintiff,           )
                                     )    GOVERNMENT'S RESPONSE TO
13        vs.                        )    DEFENDANT'S MOTION TO
                                     )    DISMISS
14                                   )
     ROLAND ASPRER DEGUZMAN,         )
15                                   )
                Defendant.           )
16   _____)

17

                        SUMMARY OF FACTS

18
        Defendant was a lesser player in a large-scale drug ring headed by Mario Mercader and
19
     Edith Fuller. Their operation was the subject of an OCDETF investigation (Operation One-
20
     Pass), with DEA the lead agency. Both Mercader and Fuller have fled to the Philippines; the
21
     United States is attempting to return them to Guam for trial.
22
        Mercader had worked on the Lufthansa Services Group (LSG) graveyard shift in the early
23
     1990s, and realized that the daily Continental flights from Manila to Guam provided an ideal
24
     mechanism for smuggling ice. The flights arrived about 4:30 a.m. daily and were serviced by
25
     LSG employees, who boarded them to restock the plane's beverages. The aircraft returned to
26
     Manila later the same day. Mercader devised a scheme whereby he would purchase ice in the
27

28                                   -1-

Philippines and hire couriers to carry it from Manila to Guam. Before deplaning, however, and running the gauntlet of Guam Custom's drug dogs and inspection teams, the couriers would hide the ice in designated seats, or in one of the aircraft lavatories. Mercader paid members of LSG's graveyard shift to retrieve the ice when they boarded the aircraft to service it, and carry it out of the airport at the end of their shift. The plan was virtually fool-proof, because there were no procedures to search employees leaving the airport. Mercader employed other people to receive the ice from the LSG employees, and sell it. By the time the DEA closed down his ring, Mercader had every member of the LSG graveyard shift on his payroll.

The investigation started in early 1997 with the arrest of three individuals who were trafficking for Mercader, one of whom agreed to cooperate with the government and laid out the logistics of Mercader's operation. During successive arrests and prosecutions, and by offering the opportunity for "substantial assistance," the DEA and this office were able to infiltrate the organization and identify its members. By February, 1999, the government had arrested, convicted and secured the cooperation of Merna Zabala, Juanito Portacio, Barbara Gaza, Allen Candelaria, Edgardo Remedios, Jose Golveo, Pablo Madlangbayan, Roy Eay and Tanya Goolsby. It had identified another ten members of the ring and was actively building cases against them. All these defendants pled guilty to informations, and all the cases were sealed, so that DEA could continue to penetrate the organization without being detected.

Defendant was working the LSG graveyard shift when the Manila flight arrived on February 4, 1999. Guam Customs had identified two of Mercader's couriers as passengers on the flight. After these two men deplaned, Guam Customs retrieved eight packages of ice from their seats, and replaced them with sham. Officers then mounted surveillance on the aircraft and observed the defendant and Roland Mora board it for servicing. After defendant and Mora left the aircraft, an officer verified the sham had been removed. Defendant and Mora were then arrested, and advised of their rights. Defendant at first denied any knowledge of these scheme and was released. On February 5, 1999, he returned to the DEA office and admitted his

-2-

1 involvement. His signed statement is attached hereto as Exhibit 1. He admitted removing ice
2 from Continental aircraft on several occasions at the behest of fellow-LSG employees Rome
3 Delima, Roland Mora and Rexileto Glory. He said he was paid $1,500 per flight for his services.

4 Mora cooperated immediately upon his arrest and was also released. He later consented
5 to a search of his residence, which led to the recovery of more ice, $31,460 cash and the eventual
6 conviction of his roommate. In seeking Mora and the defendant's cooperation, the government
7 pursued the same strategy it had employed for the other members of the Mercader ring. It
8 requested the court to appoint attorneys provisionally so that Mora and DeGuzman could
9 understand just how much trouble they were in, and determine whether it would be in their
10 interest to plead guilty and attempt to provide substantial assistance. Roland Mora, represented
11 by counsel Jay Arriola, pled guilty to an information charging possession with intent to
12 distribute ice on February 17, 1999. Copies of his information, waiver of indictment and guilty
13 plea are attached hereto as Exhibit 2. The plea was entered under seal, and Mora began working
14 with the DEA.

15 Defendant was offered the same deal: on February 12 the government forwarded a
16 proposed information and plea agreement to his counsel Basil O'Mallen. Copies of that
17 correspondence, information and plea agreement are attached hereto as Exhibit 3. The defendant
18 chose not to work for the government, but rather to leave island. According to Mora, he quit
19 LSG and left. The government has subpoened LSG for his employment records, but the
20 company cannot locate them. The DEA did not look for defendant, or attempt to arrest him,
21 because it was still running this undercover investigation.

22 Mora proved a valuable resource for the government. With his help, several loads of ice
23 were intercepted and consensually recorded conversations were made between Mora and Edith
24 Fuller in the Philippines. As a result of his cooperation, Richard Cacayurin Gonzales was
25 arrested and pled guilty to an information under seal on July 20, 1999. By April, 2000, the DEA
26 had built strong cases against the central distributors, Mario Mercader, Editha Fuller and Danny

27
28 -3-

1 Marquez. The operation was closed down and several people were indicted in addition to Fuller
2 and Mercader: the defendant: June Nario Quindo, Cynthia Sulpacio, Larry Blas, Rexielto Glory,
3 Don Crisologo, Romulo Delima, and Danny Marquez. Fuller was arrested in the Philippines a
4 week ago; Mercader is still in hiding, but every other person has pled guilty and been sentenced,
5 with the exception of the defendant. Some are still in a federal penitentiary, others are on
6 supervised release. They are all available to testify at defendant's trial.

7 The defendant was indicted April 26, 2000. The DEA should have submitted a "Form
8 202" to the U.S. Marshals Service to ensure the warrant was entered into the NCIC system, and a
9 nation-wide alert placed for him. This was not done until 2004, when in response to repeated
10 inquiries from this office, the Marshals Service checked the NCIC and realized defendant had not
11 been entered. Deputy Marshal David Punzalan entered his warrant and biographical data May 6,
12 2004. See Exhibit 4. In the meantime Operation One-Pass was closed, and the case agent, Erfel
13 Mantanguihan, returned to his duties with the Guam Police Department. The DEA assumed
14 defendant's warrant was in the system. No one attempted to locate any of his relatives on Guam
15 to learn his whereabouts because Mora had told S/A Mantanguihan defendnat had fled to the
16 Philippines. He was not arrested until May of this year, at the Guam International Airport. Thus,
17 the post-indictment delay in this case is slightly over four years.

18                                        THE LAW

19 The government concedes negligence in failing to arrest the defendant more promptly.
20 Although he had left Guam, no effort was made to contact his family members to try to ascertain
21 his whereabouts. Moreover, his passport reflects that he passed through INS inspection at the
22 Guam International Airport June 26, 2003. See Exhibit 5. Had his warrant been in the NCIC, he
23 would have been arrested then, at the very latest.

24 To no one's surprise, he has filed this motion to dismiss for violations of his Sixth
25 Amendment right to a speedy trial due to post-indictment delay.

26 Whether defendant's post-indictment right to speedy trial has been violated is determined

27

28                                          -4-

1  by four considerations, set forth in Barker v. Wingo, 407 U.S. 514, 530 (1972 ): "Length of
2  delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the
3  defendant." *Id.* at 530.  "Until there is some delay which is presumptively prejudicial, there is
4  no necessity for inquiry into the other factors that go into the balance.  Nevertheless, because of
5  the imprecision of the right to speedy trial, the length of delay that will provide such an inquiry is
6  necessarily depending upon the peculiar circumstances of the case."  *Id.*  The reason for delay is
7  also important.  "A deliberate attempt to delay the trial in order to hamper the defense should be
8  weighted heavily against the government.  A more neutral reason such as negligence or
9  overcrowded courts should be weighted less heavily, ...." *Id.* at 531.  Prejudice "should be
10 assessed in the light of the interests of defendant which the speedy trial right was designed to
11 protect.  This Court has identified three such interests: (i) to prevent oppressive pretrial
12 incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility
13 that the defense will be impaired.. *Id.* at 532.  Finally, none of these four factors "is either a
14 necessary or sufficient condition to the finding of a deprivation of the right to speedy trial.
15 Rather, they are related factors and must be considered together with such other circumstances as
16 may be relevant." *Id.* at 533.  Under this standard, the defendant had the burden of showing
17 actual prejudice to prove a violation of his post-indictment speedy trial rights.

18        Doggett v. United States, 505 U.S. 647 (1992) created a significant exception to this
19 requirement.  There, eight years passed between the time of the indictment and defendant's
20 arrest.  The delay was entirely the government's fault, and the defendant could not be faulted for
21 not demanding his speedy trial rights, because he did not know he had been charged.  The district
22 court, however, had denied his motion to dismiss because he could not make any affirmative
23 showing that the delay had prejudiced him.

24        The Court first noted that this delay was "presumptively prejudicial," thereby triggering a
25 judicial examination of his claim.  The length of delay is important, because "the presumption
26 that pretrial delay has prejudiced the accused intensifies over time." *Id.* at 652.  In view of the

27

28                                            -5-

1   inexcusable eight-year delay, the Court held that the defendant did not have to demonstrate

2   prejudice, but rather it would be presumed, and the government would have to "persuasively"

3   rebut it. *Id.* at 658.

4        A delay of as little as 13 months is presumptively prejudicial and triggers a <u>Barker</u>

5   inquiry. <u>United States v. Murillo</u>, 288 F.3d 1126 (9th Cir. 2002). Even a six-month delay

6   presents a "borderline case." <u>United States v. Valentine</u>, 783 F.2d 1413, 1417 (9th Cir. 1986). A

7   post-indictment delay of four years obviously does so. The issue is whether, under all the

8   circumstances, <u>Barker</u> requires the government to prove that his defense has not been impaired

9   by this delay, and whether the government can do so.

10       The first two factors establish an excessive delay which was largely due to the

11  government's negligence. The third factor, whether defendant exercised his rights to a speedy

12  trial, is not so clear. In this case, he knew that he was going to be charged with drug trafficking:

13  he could either plead guilty now, or if he declined to attempt to give substantial assistance, be

14  charged later. <u>United States v. Aguirre</u>, 994 F.2d 1454 (9th Cir. 1993) is somewhat on point.

15  There, the defendant was in England when he was advised a complaint had been filed against

16  him in California. He obtained an affidavit from the Embassy asking for a continuance. But

17  when he returned to California, he did not contact the authorities or make any inquiry into the

18  status of the case. He moved to Arizona and was arrested five years later on an indictment. The

19  district court found that he knew of the charges against him and failed to answer them. The

20  Ninth Circuit counted this against him. "Aguirre could have, at any moment, ended the delay

21  and avoided any prejudice caused by the passage of time. He only had to get in touch with

22  federal authorities and tell them his whereabouts, as he promised to do. Failing to assert his

23  speedy trial right, Aguirre's inaction contributed to the delay; accordingly, he is entitled to no

24  presumption of prejudice." *Id.* at 1458. The court required Aguirre to actually show he had been

25  prejudiced by the delay, which he was unable to do. In <u>Aguerre</u>, however, the district court had

26  found that the government was diligent in seeking the defendant, a factor missing here.

27

28                                    -6-

1    Were this court to find that the burden of proving prejudice has been shifted, so that the

2    government bears the burden of proving the delay has not prejudiced him, the government

3    submits that it can do so. The traditional factors to show prejudice are oppressive pretrial

4    incarceration, anxiety and concern of the accused, and the possibility that his defense will be

5    impaired. Doggett, 505 U.S. at 654. Here, there has been almost no pretrial incarceration, and if

6    defendant claims he believed the charges were being dropped, he can hardly have suffered

7    anxiety. Furthermore, there is no possibility of prejudice to his defense. Like the defendant, all

8    of his fellow employees on the LSG night crew were involved in unloading ice from the

9    Continental Manila flights. ALL of his fellow employees have pled guilty and are available for

10   trial. The government still has all of its evidence. Defendant was caught with Mora as they

11   unloaded a shipment; thus, alibi cannot apply. Defendant confessed to his involvement with

12   Mora; were he to claim duress, for example, Mora is available as a witness. Given the facts of

13   this case, it is difficult to foresee what defense defendant could mount to this charge, but

14   whatever it may be, it will not be affected by the passage of four years.

15        For the reasons stated above, defendant's motion should be denied.

16        Respectfully submitted this _25th_ day of August, 2005.

17                                              LEONARDO M. RAPADAS
                                               United States Attorney
18                                              Districts of Guam and CNMI

19
                              By:      _____
20                                              KARON V. JOHNSON
                                               Assistant U.S. Attorney
21

22

23

24

25

26

27

28                                     -7-

VOLUNTARY STATEMENT OF: Roland DEGUZMAN  Initials: RD.

FILE NUMBER:  RB-97-0004 / XNA3I

DATE OF INTERVIEW: February 05, 1999

TIME OF INTERVIEW: 4:15 p.m.

DICTATING AGENT: S/A Jon Anderson

WITNESSING AGENT: TFA Michael Aguon

I am giving the following free and voluntary statement to the above agents, who have identified themselves to me as Agents of the Drug Enforcement Administration. I have been advised that I have the right to remain silent, that any statement I make may be used against me in court or other proceedings, that I have a right to talk to a lawyer before making this statement, that if I cannot afford or otherwise obtain a lawyer one will be appointed for me by the U.S. Magistrate or court, and that I may stop this statement at any time for the purpose of consulting with a lawyer. No threats, force, or promises of rewards have been used to obtain this statement.

I started working at Lufthansa Sky Chefs, Harmon, Guam in April of 1996 as a Delivery Leadman (Delivery D.). My duties were to "strip and service" the incoming airplanes for all the airlines on Guam. About six months ago, I was approached by Roland MORA and Rome DELIMA, who both work for Lufthansa Sky Chefs, to pick up "drugs" from an airplane. I told them I wanted to think it over. The two never asked me after that. It was about four months ago when I was inside a Continental Airlines airplane stripping and serving with MORA, I was asked again by MORA to take drugs off the airplane. MORA asked me to take from underneath a passenger seat somewhere in the middle section of a Boeing 757. I decided to do what MORA asked me to do after MORA insisted and rushed me. I lifted the cushion from its seating and I saw four packages that were dark brown in color and approximately eight inches in length and two inches in width. When the servicing cabin descended to the truck, I gave MORA the four packages when we were inside the service truck. MORA then placed it inside a back pack in the truck. We drove back to the company and MORA then got out and headed in the direction of his truck while I continued to clean the truck we drove in. About one week later, MORA gave me $1,500.00 in U.S. currency at work. This was for extracting the four packages of drugs from the plane. During the times I was employed at Lufthansa Sky Chefs, I have been approached by MORA to bring in drugs from the Philippines and also to take drugs from the airplane. Rex GLORY asked me once to take drugs off the airplane and DELIMA also asked me once to take drugs off the plane. During those propositions, I only took drugs off the airplane once. I never knew what kind of drug they were asking me to take off the airplane nor did I know what kind of drug I took off the airplane as well. RD

GOVERNMENT EXHIBIT
CR0018-000-731-3399
1

On February 04, 1999, at about 6:15 a.m., after completing the strip and service of Continental Airlines 912, we were stopped by law enforcement officials in our service truck as we were exiting the airport security gate. When we were stopped, the agents found drugs in a garbage bag at the rear service cabin and immediately took MORA and myself in for questioning. I was later arrested for my knowledge and participation of drugs being smuggled in from the Philippines. RD

I HAVE READ THE FOREGOING STATEMENT. I HAVE INITIALED EACH PAGE AS WELL AS ALL CORRECTIONS. THIS STATEMENT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF. I HAVE GIVEN THIS STATEMENT FREELY AND VOLUNTARILY WITHOUT THREATS, COERCION, OR PROMISES.

_Land de Dugman_ 2-5-99  5:30 P.M.
Signature                         Date / Time

_[signature]_  02-05-99  5:32pm.
Dictating Agent                   Date / Time

_[signature]_  2/5/99
5:32p
Witnessing Agent                  Date / Time

Page(s): (2)

Initials: RD.

# REPORT OF INVESTIGATION

| Program Code | 2. Cross File | Related Files | 3. File No. RB-97-0004 | 4. G-DEP Identifier XNA3I |
|---|---|---|---|---|

| 5. By: TFA Robert D. Negrito At: Agana, Guam | 6. File Title MERCADER, Mario F. et. al. |
|---|---|

| 7. ☐ Closed ☐ Requested Action Completed ☐ Action Requested By: | 8. Date Prepared February 5, 1999 |
|---|---|

**9. Other Officers:** TFA Michael A. Aguon

**10. Report Re:** Arrest of Roland Asprer DE GUZMAN on February 4, 1999.

## SYNOPSIS:

On February 4, 1999, Guam Customs Officers located and retrieved about 800 grams(gross weight) of suspected "ice" aboard a Continental aircraft. Agents from the U.S. Customs, Guam Customs Contraband Enforcement Team, Drug Enforcement Administration Task Force conducted a controlled delivery and subsequently (2) TWO Lufthansa employees were taken into custody by the airport.

## DETAILS:

1. Reference is made to previous reports submitted under file RB-97-0004.

2. At about 7:28am.,February 4,1999, while at the Guam Customs Contraband Enforcement Team(CET) office, TFA Negrito and TFA Michael A. Aguon advised Roland A. DE GUZMAN of his constitutional rights using the Guam Customs Custodial Interrogation Form inwhich he acknowledged by signing the waiver of rights portion. Refer to attached Custodial Interrogation Form.

3. At about 7:35am., TFA Negrito and Aguon interviewed DE GUZMAN. In a summary DE GUZMAN mentioned that he has no knowledge of how the "ice" got in their truck and claims his innocence. Refer to DE GUZMANs written statement form attached.

4. At about 11:00am.,January 24, 1999, while at the GRO, TFA Negrito arrested Roland Asprer DE GUZMAN for Conspiracy to Import a controlled substance, Importation of a controlled substance. DE GUZMAN was transported to the Agana Holding Facility to processed and then confined.

| 11. Distribution: | 12. Signature (Agent) | 13. Date |
|---|---|---|
| Division SARI/NII | TFA Robert D. Negrito | 2-5-99 |
| District | 14. Approved (Name and Title) | 15. Date |
| Other | RAC James L. Mincey | 2-5-99 |

DEA Form - 6
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

**1 - Prosecutor**

## REPORT OF INVESTIGATION

*(Continuation)*

| | |
|---|---|
| 1. File No. RB-97-0004 | 2. G-DEP Identifier XNA3I |
| 3. File Title MERCADER, Mario F.. et.al. | |

4. Page 2 of 2

5. Program Code

| 6. Date Prepared |
|---|
| February 5, 1999 |

INDEXING SECTION:

1. DE GUZMAN, Roland Asprer: NADDIS unknown, male-Filipino DOB: May 04,1955 SSN: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 HT: 5'5" WT:160lbs Brown eyes, Blk/Gry hair ADD: 167 Pandan Court, Liguan Terrace, Dededo, Guam (H) (671)637-8137 (W) (671) 646-5868

DEA SENSITIVE
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

1 – Prosecutor

U.S. Department of Justice
Drug Enforcement Administration

| | | | |
|---|---|---|---|
| **REPORT OF INVESTIGATION** | | **Page 1 of** | |

| 1. Program Code | 2. Cross File | Related Files | 3. File No. RB-97-0004 | 4. G-DEP Identifier XNA3I |
|---|---|---|---|---|
| 5. By: S/A Jon Anderson At: Guam resident Office | ☐ ☐ ☐ ☐ ☐ | | 6. File Title MERCADER, Mario F. et. al. | |
| 7. ☐ Closed ☐ Requested Action Completed ☐ Action Requested By: | | | 8. Date Prepared February 05, 1999 | |

| 9. Other Officers: TFA Michael Aguon |
|---|

| 10. Report Re: INTERVIEW OF ROLAND DEGUZMAN ON 02-05-99. |
|---|

## DETAILS

1.     Reference is made to all ROIs under this file number and title, in particular, DEA ROI "ARREST OF INTERVIEW OF ROLAND DEGUZMAN ON 02-04-99, by TFA Michael Aguon, dated 02-05-99,

2.     On February 05, 1999, at approximately 4:15 p.m., S/A Jon Anderson and TFA Aguon re-interviewed Roland DEGUZMAN at the DEA GRO after his release from prison.  DEGUZMAN wanted to recant his 02-04-99 interview in which he denied any involvement in a crystal methamphetamine (a.k.a. "ice") smuggling ring by employees of the Lufthansa Sky Chefs (LSC), Harmon, Guam.  The interview was a dictation of DEGUZMAN's interview.  DEGUZMAN requested the ents type his statement because of his poor writing abilities.

3.     DEGUZMAN said that he first started to work for LSC in April of 1996 as a Delivery Lead man (Delivery Driver).  It was about six months ago that DEGUZMAN was approached and asked at separate times by Roland MORA, Rex GLORY and Rome DELIMA, who are also employees of LSC, to smuggle drugs off airplanes originating from the Philippines.  DEGUZMAN told the two men he will think it over.  DEGUZMAN was also asked by the men to travel, via Continental Airlines, to the Philippines and smuggle in "ice".  He declined their offer.

4.     It was about four months ago when DEGUZMAN and MORA were inside a Continental Airlines 757 airplane striping and servicing when MORA asked DEGUZMAN to take four packages out from underneath a passenger seat somewhere in the middle section of the airplane.  DEGUZMAN took out the four packages and handed the packages to MORA while the two were inside the service truck. About one week later, MORA gave DEGUZMAN $1,500.00 in U.S. currency for his

| 11. Distribution: Division SARI / NII | 12. Signature (Agent) S/A Jon Anderson | 13. Date 02-05-99 |
|---|---|---|
| District | 14. Approved (Name and Title) RAC James L. Mincey | 15. Date 2-5-99 |
| Other | | |

DEA Form -6
(Aug. 1994)

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.
Previous edition dated 5/80 may be used.

| **REPORT OF INVESTIGATION** | 1. File No.<br>RB-97-0004 | 2. G-DEP Identifier<br>XNA3I |
|---|---|---|
| *(Continuation)* | 3. File Title | |
| 4.<br>    **Page**    **of** | MERCADER, Mario F. et. al. | |
| 5. Program Code | 6. Date Prepared<br>February 05, 1999 | |

part in taking the packages off the airplane. DEGUZMAN said the packages were dark brown in color and about eight inches in length and two inches in width.

4.    DEGUZMAN told the agents he never knew what type of drug the men were smuggling off the airplane only that he knew it was illegal.    DEGUZMAN said he never knew that there was drugs in Continental Airlines Flight 912 until agents stopped MORA and him at the Guam International Airport security gate where their LSC service truck was searched by the agents.

**INDEXING**

1.    DEGUZMAN, Roland; NADDIS # pending; previously described.

2.    MORA, Roland; NADDIS # pending; previously described.

3.    GLORY, Rex; NADDIS # pending; previously described.

  .    DELIMA, Rome; NADDIS # pending; previously described.

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 5/80 may be used.

Mora.Inf

FREDERICK A. BLACK
United States Attorney
KARON V. JOHNSON
Assistant U.S. Attorney
Suite 502-A, Pacific News Bldg.
238 Archbishop Flores St.
Agana, Guam  96910
Telephone:  (671) 472-7332/7283
Telecopier: (671) 472-7334/7215

Attorneys for United States of America

**FILED**
DISTRICT COURT OF GUAM

FEB 1 6 1999

MARY L. M. MORAN
CLERK OF COURT

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE TERRITORY OF GUAM**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>          vs.<br><br>ROLAND JOSEPH BALANGON MORA,<br><br>          Defendant. | CRIMINAL CASE NO. **99-00024**<br><br>**INFORMATION**<br><br>ATTEMPTED POSSESSION OF<br>METHAMPHETAMINE HYDROCHLORIDE<br>WITH INTENT TO DISTRIBUTE<br>[21 U.S.C. § 841(a)(1)] |

THE UNITED STATES ATTORNEY CHARGES:

On or about February 4, 1999, in the District of Guam, the

defendant herein, ROLAND JOSEPH BALONGON MORA, did unlawfully and

knowingly attempt to possess approximately 850 grams gross weight

of methamphetamine hydrochloride, also known as ice, a Schedule

II

//

//

//

//

//

//

COPY

GOVERNMENT
EXHIBIT
2

1  controlled substance, with the intent to distribute said ice, all

2  in violation of 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1).

3      Dated this ___16___ day of February, 1999.

4                          FREDERICK A. BLACK
                           United States Attorney
5                          Districts of Guam and CNMI

6

7                  By: _Karon V. Johnson_

8                          KARON V. JOHNSON
                           Assistant U.S. Attorney

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-2-

F I L E D
DISTRICT COURT OF GUAM

FEB 1 6 1999

MARY L.M. MORAN
CLERK OF COURT

# United States District Court

FOR THE _____ DISTRICT OF _____ **GUAM**

UNITED STATES OF AMERICA

V.

ROLAND  JOSEPH  BALANGON  MORA

## WAIVER OF INDICTMENT

CASE NUMBER:  **99-00024**

I,  ROLAND  JOSEPH  BALANGON  MORA _____ , the above named defendant, who is accused of

**ATTEMPTED POSSESSION OF METHAMPHETAMINE HYDROCHLORIDE WITH INTENT
TO DISTRIBUTE, IN VIOLATION OF 21 U.S.C. § 841(a)(1)**

being advised of the nature of the charge(s). the proposed information, and of my rights. hereby waive

in open court on ___ **February 16, 1999** _____ prosecution by indictment and consent that the

*Date*

proceeding may be by information rather than by indictment.

RECEIVED

FEB 17 1999
Gon Guam
U.S. Attorney's Office
District of Guam

_____
*Defendant*  ROLAND  JOSEPH  BALANGON  MORA

_____
*Counsel for Defendant*  JOAQUIN  C.  ARRIOLA, JR.

**/s/ John S. Unpingco**

Before _____

Mora.ple

2  FREDERICK A. BLACK
   United States Attorney
3  KARON V. JOHNSON
   Assistant U.S. Attorney
4  Suite 502-A, Pacific News Bldg.
   238 Archbishop Flores Street
5  Agana, Guam 96910
   Telephone:  (671) 472-7332/7283
6  Telecopier: (671) 472-7334

7  Attorneys for United States of America

**FILED**
DISTRICT COURT OF GUAM

FEB 1 7 1999

MARY L. M. MORAN
CLERK OF COURT

8           **IN THE UNITED STATES DISTRICT COURT**

9              **FOR THE TERRITORY OF GUAM**

10

11 UNITED STATES OF AMERICA,    )    CRIMINAL CASE NO. 99-00024
                                )
12              Plaintiff,      )
                                )
13       vs.                    )    **AMENDED PLEA AGREEMENT**
                                )
   ROLAND JOSEPH BALANGON MORA, )
                                )
15              Defendant.      )
   _____)

16

17       Pursuant to Rule 11(e)(1)(B), the United States and the

18  defendant, ROLAND J.B. MORA, enter into the following plea

19  agreement:

20       1.  The defendant agrees to waive indictment and enter a

21  guilty plea to an Information charging him with Attempted

22  Possession with Intent to Distribute approximately 850 grams

23  gross weight of methamphetamine hydrochloride (ice), in violation

24  of Title 21 U.S.C. § 841(a)(1).

25       2.  The defendant, ROLAND J.B. MORA, further agrees to fully

26  and truthfully cooperate with Federal law enforcement agents

27  concerning their investigation of the importation, possession,

28  and distribution of controlled substances and related unlawful

activities, including the disposition of profits from and assets relating to such activities. He agrees to testify fully and truthfully before any grand juries and at any trials or proceedings if called upon to do so by the United States, subject to prosecution for perjury for not testifying truthfully. The United States will make this cooperation known to the Court prior to the defendant's sentencing. The defendant further understands that he remains liable and subject to prosecution for any criminal narcotic schemes of which he does not fully advise the United States, or for any material omissions in this regard. In return for this cooperation, the United States agrees not to prosecute defendant for any other non-violent narcotic offenses now known to the government or which he reveals to Federal authorities.

3. The defendant, ROLAND J.B. MORA, understands and agrees that any and all assets or portions thereof acquired or obtained by him as a direct or indirect result of illegal trafficking in drugs or used to facilitate such illegal activity shall be surrendered to the United States or any lawful agency as may be directed by the Court. The assets to be surrendered include, but are not limited to cash, stocks, bonds, certificates of deposit, personal property and real property.

4. The defendant, ROLAND J.B. MORA, further agrees to submit to a polygraph examination by any qualified Federal polygraph examiner. The defendant understands that such

- 2 -

polygraph examinations may include, but will not be limited to,
his knowledge of or involvement in unlawful drug related
activities, his knowledge of others' involvement in unlawful drug
related activities, and the identification of any and all assets
and conveyances acquired in whole or in part by the defendant or
others through unlawful drug related activities or the use of
such assets or conveyances to further such unlawful activities.
Defendant understands that the government will rely on the
polygraph in assessing whether he has been fully truthful.

5.    The defendant, ROLAND J.B. MORA, understands that the
maximum sentence for Attempted Possession with Intent to
Distribute approximately 850 grams gross weight of
methamphetamine hydrochloride (ice) is life imprisonment with a
mandatory minimum term of ten (10) years incarceration, a
$4,000,000 fine, and a $100 special assessment fee, which must be
paid at the time of sentencing.  Any sentence imposed shall
include a term of supervised release of at least five (5) years
in addition to such terms of imprisonment. Defendant understands
that, if at any time while he is on supervised release he
violates one of its conditions, his supervised release may be
revoked and he may be subject to an additional term of
imprisonment.  If defendant cooperates as set forth in Paragraphs
2, 3, and 4, the government will recommend that defendant receive
the statutory minimum, if applicable, or minimum term of
incarceration recommended by the Sentencing Guidelines, whichever

- 3 -

is greater. In addition, if defendant provides full, truthful, and substantial assistance to investigating federal agencies, the government will move the Court, as provided by USSG 5K.1.1, and 18 U.S.C. § 3553(e), for a downward departure from the Guidelines and the statutory minimum sentence. Defendant understands that "substantial assistance" encompasses such significant and useful assistance directed to the investigation and prosecution of the criminal activities of other persons, as is set forth by USSG 5K1.1. Defendant also understands that the decision whether to depart from the Guidelines, and the statutory minimum sentence, and to what degree, is within the discretion of the sentencing judge. The government agrees not to take a position concerning that amount of incarceration the court should impose. If defendant does not fully cooperate as set forth in Paragraphs 2, 3, and 4, the government will recommend whatever sentence of incarceration within the Guidelines range it may deem appropriate.

The government will recommend a fine within the Sentencing Guidelines range. If defendant is financially unable to immediately pay the fine in full, defendant agrees to make a full disclosure of his financial status to the United States Attorney's Office by completing a Financial Disclosure Form (OBD-500) for purpose of fixing a monthly payment schedule. Defendant understands that, by law, interest accrues on any remaining balance of the debt.

- 4 -

6. The defendant understands that to establish a violation of importation of a controlled substance, pursuant to 21 U.S.C. § 841(a)(1), the government must prove each of the following elements beyond a reasonable doubt:

> **First**: the defendant intended to possess methamphetamine hydrochloride (ice) with the intent to deliver it to another person; and

> **Second**: the defendant did something that was a substantial step toward committing the crime.

7. The defendant understands that the Sentencing Guidelines apply to this offense. The defendant also understands that the facts he stipulates to herein will be used, pursuant to 1B1.2, in calculating the applicable guidelines level, even though the counts underlying this conduct may be dismissed. The Government and the defendant stipulate to the following facts for purposes of the Sentencing Guidelines:

a. The defendant was born August 22, 1974 and is a citizen of the United States.

b. If the defendant cooperates with the United States by providing information concerning the unlawful activities of others, the government agrees that any self-incriminating information so provided will not be used against defendant in assessing his punishment, and therefore, pursuant to § 1B1.3 of the Sentencing Guidelines, this information should not be used in determining the applicable guidelines range.

c. Defendant is an employee of Lufthansa Service Guam. Among his duties, he boards planes after they have arrived on

- 5 -

Guam and removes the trays, utensils and other items related to
food service on the plane. In 1998 he was approached by a
person, who asked him to use his position to retrieve bags of ice
being imported from the Philippines to Guam aboard the daily
Continental flight from Manila. Mora agreed. On three occasions
during 1998 and January, 1999, he and confederates removed
packages of ice which had been hidden on the plane by couriers
traveling from Manila to Guam. On each occasion he delivered the
packages of ice to other people working for the person. He would
be paid $1,500 per package. On February 2, 1999, Mora was
advised that ice would be secreted in seats on the Continental
Manila flight, and he intended to retrieve it.

When Continental flight 912 arrived on Guam February 4,
1999, the passengers deplaned and Guam Customs officers and
narcotics dogs made their customary sweep through the plane.
Eight packages of ice, approximately 850 grams gross weight, was
discovered hidden in seats on the plane. Guam Customs and DEA
agents removed the ice and repackaged it with six packages of
sham. Later defendant and LSG employee Roland De Guzman boarded
the flight and cleared the LSG items from the galleys. Defendant
had told De Guzman that the ice was hidden in the seats. De
Guzman took five packages of sham from where they were hidden in
the seats and put them in the trash cart. Defendant put the
trash cart into the LSG truck. He intended to deliver the
packages to the person who had directed him to recover them, or

- 6 -

1   to members of his ring.

2       d.   The defendant understands that notwithstanding any

3   agreement of the parties, the United States Probation Office will

4   make an independent application of the Sentencing Guidelines.

5   The defendant acknowledges that should there be discrepancies in

6   the final sentencing guidelines range projected by his counsel or

7   any other person, such discrepancies are not a basis to withdraw

8   his guilty plea.

9       8.   The defendant understands that this plea agreement

10  depends on the fullness and truthfulness of his cooperation.

11  Therefore, defendant understands and agrees that if he should

12  fail to fulfill completely each and every one of his obligations

13  under this plea agreement, or make material omissions or

14  intentional misstatements or engage in criminal conduct after the

15  entry of his plea agreement and before sentencing, the government

16  will be free from its obligations under the plea agreement; thus

17  defendant, in addition to standing guilty of the matters to which

18  he has pled pursuant to this agreement, shall also be fully

19  subject to criminal prosecution for other crimes, and for the

20  counts which were to be dismissed.  In any such prosecution, the

21  prosecuting authorities, whether Federal, State, or Local, shall

22  be free to use against him, without limitation, any and all

23  information, in whatever form, that he has provided pursuant to

24  this plea agreement or otherwise; defendant shall not assert any

    ﾘ   claim under the United States Constitution, any statute, Rule

26

                                - 7 -

27

11(e)(6) of the Federal Rules of Criminal Procedure, Rule 410 of
the Federal Rules of Evidence, or any other provision of law, to
attempt to bar such use of the information.

9.   The defendant understands that his sentencing may be
continued, at the sole discretion of the United States, until
after the indictment and trial of any associates involved.  This
will also enable the Court to see the full degree of the
defendant's cooperation.  The defendant therefore waives any
right he may have to any speedy sentencing and hereby agrees to
any continuance of his sentencing date as it may become
necessary.

10.   The defendant waives any right to appeal or to
collaterally attack this conviction but reserves the right to
appeal the sentence imposed in this case.

11.   The defendant acknowledges that he has been advised of
his rights as set forth below prior to entering into this plea
agreement.  Specifically, defendant has been fully advised of,
has had sufficient opportunity to reflect upon, and understands
the following:

a.   The nature and elements of the charge and the
mandatory minimum penalty provided by law, if any, and the
maximum possible penalty provided by law;

b.   His right to be represented by an attorney;

c.   His right to plead not guilty and the right to be
tried by a jury and at that trial, the right to be represented by

- 8 -

1   counsel, the right to confront and cross-examine witnesses

2   against him, and the right not to be compelled to incriminate

3   himself, that is, the right not to testify;

4          d.  That if he pleads guilty, there will not be a

5   further trial of any kind on the charges to which such plea is

6   entered so that by entering into this plea agreement, he waives,

7   that is, gives up, the right to a trial;

8          e.  That, upon entry of a plea of guilty, or thereafter,

9   the Court may ask his questions about the offenses to which he

10  has pled, under oath, and that if he answers these questions

11  under oath, on the record, his answers may later be used against

12  him in prosecution for perjury or false statement if an answer is

13  untrue;

14         f.  That he agrees that the plea agreement is voluntary

15  and not a result of any force, threats or promises apart from

16  this plea agreement;

17  //

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

26

- 9 -

27

28

g.  The defendant is satisfied with the representation of his lawyer and feels that his lawyer has done everything possible for his defense.

DATED: 2/17/99

_____
ROLAND J.B. MORA
Defendant

DATED: 2/17/99

_____
JOAQUIN C. ARRIOLA, JR.
Attorney for Defendant

FREDERICK A. BLACK
United States Attorney
Districts of Guam and CNMI

DATED: 2/17/99        By: _____
KARON V. JOHNSON
Assistant U.S. Attorney

- 10 -





*deguz.ltr*

HIGHSMITH & O'MALLAN, P.C.
ATTORNEYS AT LAW

Suite 502 A, Pacific News Building
238 Archbishop Flores Street
Agana, Guam 96910

(671) 472-7332

FAX (671) 472-7334/7215

FEB 1 2 1999

TIME: 4:30 p.m.

BY:

February 12, 1999

J. Basil O'Mallen, III
Attorney at Law
134 Chalan Santo Papa, Ste. 204
Agana, Guam 96910

Re: <u>United States v. Roland Asprer DeGuzman</u>

Dear Basil,

DeGuzman and his partner Roland Mora were arrested last week by DEA as they left a Continental plane which they had just serviced for LSG. Eight packages of ice had been discovered on the flight, which just arrived from Manila. DEA had replaced the ice with sham, which ended up in DeGuzman and Mora's service truck.

Although initially both men denied knowing what it was, eventually they both confessed. Because both are in a position to give substantial assistance, we released them as soon as they agreed to cooperate, and asked the Court appoint counsel for them. Jay Arriola is representing Mora; Rose advises me that you would be assigned DeGuzman, as the next attorney up on the panel.

I am enclosing a plea offer, proposed information and reports concerning DeGuzman's statements. Ironically, he appears not to know that there was a load on the February 4 flight. He admitted moving four packages on a December flight he and Mora serviced, so the plea is to that matter.

Please call if you have any questions.

Sincerely,

FREDERICK A. BLACK
United States Attorney
Districts of Guam and NMI

By:

KARON V. JOHNSON
Assistant U.S. Attorney

GOVERNMENT
EXHIBIT
3

1 | DeGuzman.INF

2 | FREDERICK A. BLACK
United States Attorney
3 | KARON V. JOHNSON
Assistant U.S. Attorney
4 | Suite 502-A, Pacific News Bldg.
238 Archbishop Flores St.
5 | Agana, Guam 96910
Telephone: (671) 472-7332/7283
6 | Telecopier: (671) 472-7334/7215

HIGHSMITH & O'MALLAN, P.C.
ATTORNEYS AT LAW

FEB 1 2 1999

TIME: _____
BY: _____

7 | Attorneys for United States of America

8 |

9 | **IN THE UNITED STATES DISTRICT COURT**

10 | **FOR THE TERRITORY OF GUAM**

11 | UNITED STATES OF AMERICA, )    CRIMINAL CASE NO. _____

12 |          )

13 |       Plaintiff, )    **INFORMATION**

14 |       vs. )    DISTRIBUTION OF METHAMPHEMIE
         )    HYDROCHLORIDE

ROLAND ASPRER DEGUZMAN, )    [21 U.S.C. § 841(a)(1)]

15 |          )

16 |       Defendant. )
_____ )

17 |

18 | THE UNITED STATES ATTORNEY CHARGES:

19 |      During December, 1998, in the District of Guam, the defendant herein, ROLAND ASPI

20 | DEGUZMAN, did unlawfully and knowingly possess with intent to distribute approximately 40

21 | \\

22 | \\

23 | \\

24 | \\

25 | \\

26 | \\

27 | \\

28 | \\

1  grams gross weight of methamphetamine hydrochloride, also known as ice, a Schedule II control

2  substance, all in violation of 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1).

3  Dated this _____ day of February, 1998.

4                                          FREDERICK A. BLACK
                                           United States Attorney
5                                          Districts of Guam and CNMI

6

7  By:   _____

8                                          KARON V. JOHNSON
                                           Assistant U.S. Attorney

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DeGuz.PLE

FREDERICK A. BLACK
United States Attorney
KARON V. JOHNSON
Assistant U.S. Attorney
Suite 502-A, Pacific News Bldg.
238 Archbishop Flores Street
Agana, Guam 96910
Telephone: (671) 472-7332/7283
Telecopier: (671) 472-7334

Attorneys for United States of America

HIGHSMITH & O'MALLAN. F C.
_ ATTORNEYS A L W

FEB 1 2 1999

TIME: 4;30 pm
BY:

## IN THE UNITED STATES DISTRICT COURT

## FOR THE TERRITORY OF GUAM

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CRIMINAL CASE NO. _____ |
| Plaintiff, | ) | |
| vs. | ) | **PLEA AGREEMENT** |
| ROLAND ASPRER DE GUZMAN, | ) | |
| Defendant. | ) | |

Pursuant to Rule 11(e)(1)(B), the United States and the defendant, ROLAND ASPRER DE GUZMAN, enter into the following plea agreement:

1. The defendant agrees to enter a guilty plea to an Information charging him with Distribution of approximately 850 grams gross weight of methamphetamine hydrochloride (ice), in violation of Title 21 U.S.C. § 841(a)(1).

2. The defendant, ROLAND ASPRER DE GUZMAN, further agrees to fully and truthfully cooperate with Federal law enforcement agents concerning their investigation of the importation, possession, and distribution of controlled substances and related unlawful activities, including the disposition of profits from and assets relating to such activities. He agrees to testify fully and truthfully before any grand juries and at any trials or proceedings if called upon to do so by the United States, subject to prosecution for perjury for not testifying truthfully. The United States will make this cooperation known to the Court prior to the defendant's sentencing. The defendant

further understands that he remains liable and subject to prosecution for any criminal narcotic schemes of which he does not fully advise the United States, or for any material omissions in this regard. In return for this cooperation, the United States agrees not to prosecute defendant for an other non-violent narcotic offenses now known to the government or which he reveals to Federa authorities.

3. The defendant, ROLAND ASPRER DE GUZMAN, understands and agrees that any and all assets or portions thereof acquired or obtained by him as a direct or indirect result of illeg trafficking in drugs or used to facilitate such illegal activity shall be surrendered to the United States or any lawful agency as may be directed by the Court. The assets to be surrendered includ but are not limited to cash, stocks, bonds, certificates of deposit, personal property and real property.

4. The defendant, ROLAND ASPRER DE GUZMAN, further agrees to submit to a polygraph examination by any qualified Federal polygraph examiner. The defendant understands that such polygraph examinations may include, but will not be limited to, his knowledge of or involvement in unlawful drug related activities, his knowledge of others' involvement in unlawful drug related activities, and the identification of any and all assets and conveyances acquired in whole or in part by the defendant or others through unlawful drug related activities or the use of such assets or conveyances to further such unlawful activities. Defendant understands that the government will rely on the polygraph in assessing whether he has been fully truthful.

5. The defendant, ROLAND ASPRER DE GUZMAN, understands that the maximum sentence for Distribution of approximately 400 grams gross weight of methamphetamine hydrochloride (ice) is life imprisonment with a mandatory minimum term of ten (10) years incarceration, a $4,000,000 fine, and a $100 special assessment fee, which must be paid at the tim of sentencing. Any sentence imposed shall include a term of supervised release of at least five (5) years in addition to such terms of imprisonment. Defendant understands that, if at any time while I is on supervised release he violates one of its conditions, his supervised release may be revoked an he may be subject to an additional term of imprisonment. If defendant cooperates as set forth in

- 2 -

Paragraphs 2, 3, and 4, the government will recommend that defendant receive the statutory minimum, if applicable, or minimum term of incarceration recommended by the Sentencing Guidelines, whichever is greater. In addition, if defendant provides full, truthful, and substantial assistance to investigating federal agencies, the government will move the Court, as provided by USSG 5K.1.1, and 18 U.S.C. § 3553(e), for a downward departure from the Guidelines and the statutory minimum sentence. Defendant understands that "substantial assistance" encompasses such significant and useful assistance directed to the investigation and prosecution of the criminal activities of other persons, as is set forth by USSG 5K1.1. Defendant also understands that the decision whether to depart from the Guidelines, and the statutory minimum sentence, and to what degree, is within the discretion of the sentencing judge. The government agrees not to take a position concerning that amount of incarceration the court should impose. If defendant does not fully cooperate as set forth in Paragraphs 2, 3, and 4, the government will recommend whatever sentence of incarceration within the Guidelines range it may deem appropriate.

The government will recommend a fine within the Sentencing Guidelines range. If defendant is financially unable to immediately pay the fine in full, defendant agrees to make a full disclosure of his financial status to the United States Attorney's Office by completing a Financial Disclosure Form (OBD-500) for purpose of fixing a monthly payment schedule. Defendant understands that, by law, interest accrues on any remaining balance of the debt.

6. The defendant understands that to establish a violation of importation of a controlled substance, pursuant to 21 U.S.C. § 952, the government must prove each of the following elements beyond a reasonable doubt:

> First: the defendant knowingly distributed methamphetamine hydrochloride (ice) to another person;

> Second: the defendant knew it was methamphetamine hydrochloride or some other prohibited drug.

7. The defendant understands that the Sentencing Guidelines apply to this offense. The defendant also understands that the facts he stipulates to herein will be used, pursuant to 1B1.2,

– 3 –

calculating the applicable guidelines level, even though the counts underlying this conduct ma[...]

dismissed. The Government and the defendant stipulate to the following facts for purposes o[...]

Sentencing Guidelines:

a. The defendant was born May 4, 1955, and is a citizen of the United States.

b. If the defendant cooperates with the United States by providing information concerning the unlawful activities of others, the government agrees that any self-incriminating information so provided will not be used against defendant in assessing his punishment, and therefore, pursuant to § 1B1.3 of the Sentencing Guidelines, this information should not be us[...] determining the applicable guidelines range.

c. Defendant is an employee of Lufthansa Service Guam (LSG). Among his duties boards planes after they have arrived on Guam and removes the trays, utensils and other item[...] related to food service on the plane. In 1998, he was approached by other employees at LSG asked to smuggle drugs off flights originating from the Philippines. In December, 1998, he an[...] LSG employee Roland Mora were servicing a flight which had arrived from Manila, and whic[...] knew contained packages of ice concealed by couriers in certain passenger seats. Defendant retrieved four packages, each approximately 8 inches in length and 2 inches in width, from a designated row of seats. He gave them to Mora, who placed them in the LSG truck and drov[...] them off the airport grounds. Ultimately, Mora delivered them to members of a drug ring. Defendant received $1,500 from Mora for retrieving the four packages. Defendant did not kn[...] specifically which illegal substance was being smuggled into Guam, but he knew the packages contained a illegal controlled substance.

d. The defendant understands that notwithstanding any agreement of the parties, th[...] United States Probation Office will make an independent application of the Sentencing Guideli[...] The defendant acknowledges that should there be discrepancies in the final sentencing guidelin[...] range projected by his counsel or any other person, such discrepancies are not a basis to withd[...] his guilty plea.

8. The defendant understands that this plea agreement depends on the fullness and

– 4 –

truthfulness of his cooperation. Therefore, defendant understands and agrees that if he shou

to fulfill completely each and every one of his obligations under this plea agreement, or make

material omissions or intentional misstatements or engage in criminal conduct after the entry

plea agreement and before sentencing, the government will be free from its obligations under

plea agreement; thus defendant, in addition to standing guilty of the matters to which he has

pursuant to this agreement, shall also be fully subject to criminal prosecution for other crime

for the counts which were to be dismissed. In any such prosecution, the prosecuting authori

whether Federal, State, or Local, shall be free to use against him, without limitation, any and

information, in whatever form, that he has provided pursuant to this plea agreement or other

defendant shall not assert any claim under the United States Constitution, any statute, Rule 1

of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or ar

other provision of law, to attempt to bar such use of the information.

9. The defendant understands that his sentencing may be continued, at the sole discre

the United States, until after the indictment and trial of any associates involved. This will als

enable the Court to see the full degree of the defendant's cooperation. The defendant therefo

waives any right he may have to any speedy sentencing and hereby agrees to any continuance

sentencing date as it may become necessary.

10. The defendant waives any right to appeal or to collaterally attack this conviction

reserves the right to appeal the sentence imposed in this case.

11. The defendant acknowledges that he has been advised of his rights as set forth be

prior to entering into this plea agreement. Specifically, defendant has been fully advised of, h

sufficient opportunity to reflect upon, and understands the following:

    a. The nature and elements of the charge and the mandatory minimum penalty prov

by law, if any, and the maximum possible penalty provided by law;

    b. His right to be represented by an attorney;

    c. His right to plead not guilty and the right to be tried by a jury and at that trial, th

right to be represented by counsel, the right to confront and cross-examine witnesses against l

- 5 -

and the right not to be compelled to incriminate himself, that is, the right not to testify;

　　　　d. That if he pleads guilty, there will not be a further trial of any kind on the charge[s] which such plea is entered so that by entering into this plea agreement, he waives, that is, give[s] the right to a trial;

　　　　e. That, upon entry of a plea of guilty, or thereafter, the Court may ask his question[s] about the offenses to which he has pled, under oath, and that if he answers these questions un[der] oath, on the record, his answers may later be used against him in prosecution for perjury or fa[lse] statement if an answer is untrue;

　　　　f. That he agrees that the plea agreement is voluntary and not a result of any force, threats or promises apart from this plea agreement;

　　　　g. The defendant is satisfied with the representation of his lawyer and feels that his lawyer has done everything possible for his defense.


DATED: _____

　　　　　　　　　　　　　　　　ROLAND ASPRER DE GUZMAN
　　　　　　　　　　　　　　　　Defendant


DATED: _____

　　　　　　　　　　　　　　　　JAMES BASIL O'MALLEN, III
　　　　　　　　　　　　　　　　Attorney for Defendant


　　　　　　　　　　　　　　　　FREDERICK A. BLACK
　　　　　　　　　　　　　　　　United States Attorney
　　　　　　　　　　　　　　　　Districts of Guam and CNMI


DATED: _____　　　By:

　　　　　　　　　　　　　　　　KARON V. JOHNSON
　　　　　　　　　　　　　　　　Assistant U.S. Attorney


- 6 -

**From:** Linda Albimino
**To:** John Curry
**Date:** 6/18/05 2:57am
**Subject:** FW: FID #860032

Hi John:
Please see below for the NCIC history on FID #860032.

-----Original Message-----
From: Newcomb, Larry (USMS)
Sent: Friday, June 17, 2005 12:52 PM
To: Albimino, Linda (USMS)
Cc: Jenkins, Debra (USMS)
Subject: RE: FID #860032

Entered by David Punzalan on 5/6/2004.
Closed by John Curry on 5/2/2005.

           -----Original Message-----
           From: Albimino, Linda (USMS)
           Sent: Friday, June 17, 2005 12:32 PM
           To: Newcomb, Larry (USMS)
           Cc: Jenkins, Debra (USMS)
           Subject: FID #860032

           Hi Larry:
           Guam requested a check of the NCIC logs to determine who
entered and closed the record on FID #860032 (Roland Asprer DE GUZMAN).

           Thank you --

           Linda Albimino
           Analytical Support Unit
           Investigative Services Division
           U. S. Marshals Service
           (202) 307-9265
           (202) 307-9650 (fax)





# UNITED STATES MARSHALS SERVICE
## District of Guam
### 344 United States District Courthouse
### 520 West Soledad Avenue
### Hagatna, Guam 96910
### Office: 671-477-7827 (STAR)
### Facsimile: 671-473-9195

TO: _K. Johnson_

FROM: _John Curry (J.C.)_

DATE: _6/22/05_

NUMBER OF PAGES: _1_   **Excluding Cover Sheet**

COMMENTS: _NCIC Info_

_898-6803_
_cell_

GUAM IS AN UNITED STATES TERRITORY. GUAM IS ON THE OTHER SIDE OF THE INTERNATIONAL
DATELINE FROM THE U.S. MAINLAND. WHEN IT IS 12:00 NOON, JANUARY 1st IN LOS ANGELES, IT IS
6:00 A.M. JANUARY 2nd ON GUAM. PLEASE NOTE: WHEN THE CONTINENTAL U.S. IS ON DAYLIGHT
SAVINGS TIME, ADD ONE HOUR TO THE TIME FOR YOUR RESPECTIVE U.S. REGION

The Secretary of State of the United States of America
hereby requests all whom it may concern to permit the citizen/national
of the United States named herein to pass without delay or hindrance
and in case of need to give all lawful aid and protection.

Le Secrétaire d'État des États-Unis d'Amérique
prie par les présentes toutes autorités compétentes de laisser passer le citoyen
ou ressortissant des États-Unis titulaire du présent passeport, sans délai ni
difficulté et, en cas de besoin, de lui accorder toute aide et protection légitimes.

El Secretario de Estado de los Estados Unidos de América por el presente solicita a las
autoridades competentes permitir el pase del ciudadano o nacional de los Estados Unidos
aquí mencionado, sin demora ni dificultades, y en caso de necesidad, prestarle toda la
ayuda y protección lícitas.

*Roland A. D. Guzman*

SIGNATURE OF BEARER/SIGNATURE DU TITULAIRE/FIRMA DEL TITULAR

NOT VALID UNTIL SIGNED

PASSPORT
PASSEPORT

USA

UNITED STATES OF AMERICA

DE GUZMAN

ROLAND ASPRER

Nationality / Nationalité / Nacionalidad
UNITED STATES OF AMERICA

Date of birth
04 May 19XX

Place of birth
PHILIPPINES

Date of issue
01 May 2003

Date of expiration
30 Apr 2013

Amendments / Modifications / Enmiendas
See Page 24

P<USA DE<GUZMAN<<ROLAND<ASPRER<<<<<<<<<<<<<<
2085400296USA5505049M1304303<<<<<<<<<<<<

GOVERNMENT
EXHIBIT
5



Case 1:00-cr-00052    Document 24-3    Filed 08/25/2005    Page 1 of 6

## WHILE IN THE FOREIGN COUNTRY

1. Register with the U.S. Embassy: When traveling to remote or volatile areas, visiting a foreign country for a prolonged stay, or residing abroad — register with the U.S. embassy or consulate by telephone, fax or in person.

2. Be mindful of threats: Do not leave luggage unattended in public areas or accept packages from strangers.

3. Avoid violating local laws: Deal only with authorized agents when exchanging money or purchasing souvenirs.

4. Trouble: Contact the nearest U.S. embassy or consulate. If you are arrested, demand to see the U.S. consul.

5. Disaster and Other Serious Events: If a catastrophic event occurs, call home to let family and friends know you are okay. If you require assistance, contact the nearest U.S. embassy or consulate.

6. U.S. Taxes: All U.S. citizens working and residing overseas are required to file and report on their worldwide income. Consult the IRS at http://www.irs.ustreas.gov/prod/tax_edu/teac/teap.htm for Tax information for Aliens and U.S. Citizens Living Abroad. See also IRS Publication 54, "Tax Guide for U.S. Citizens and Resident Aliens Abroad."

7. Social Security: inquiries should be directed to the Social Security Administration, Office of International Programs. Inquiry http://www.ssa.gov/international_programs/ or write to Social Security Administration, Office of International Operations, P.O. Box 17769, Baltimore, MD 21235, or contact the nearest U.S. Social Security office in the United States or at the U.S. embassy or consulate abroad.

8. Loss of U.S. Citizenship: Under certain circumstances, you may lose your U.S. citizenship by performing, voluntarily and with

the intention to relinquish U.S. nationality, any of the following: (1) being naturalized in a foreign state; (2) taking an oath or making a declaration to a foreign state; (3) serving in the armed forces of a foreign state; (4) accepting employment with a foreign government; or (5) formally renouncing U.S. citizenship before a U.S. consular officer overseas. Consult the nearest American Embassy or consulate, or contact the Office of American Citizens Services and Crisis Management, Department of State, 2201 C Street, N.W., Room 4817, Washington, D.C. 20520-4818; or call 1-202-647-5225. You may continue to have U.S. tax liability even if you lose U.S. nationality. Address questions on this topic to the IRS.

9. Dual Citizens: A person who has the citizenship of more than one country at the same time is considered a dual citizen. A dual citizen owes allegiance to the laws of the other country that considers that person to the citizen while in that country's jurisdiction. In-asmuch as U.S. law does not require U.S. citizenship, U.S. law may not prevent a possible conflict under the laws of that other country. Dual nationality may limit U.S. Government efforts to provide U.S. consular protection to dual citizens in the foreign country of their other nationality. Dual citizens who encounter problems abroad should contact the nearest American embassy or consulate.

## OTHER IMPORTANT INFORMATION

1. U.S. Customs Service: Contact the U.S. Customs Service, http://www.customs.ustreas.gov for a copy of "Know Before You Go" and "Pets, Wildlife, U.S. Customs."

2. Agriculture: Consult the U.S. Department of Agriculture, http://www.aphis.usda.gov/oa/travel.html for a copy of "Travelers Tips On Bringing Food, Plant, and Animal Products Into the United States." See also U.S. Fish and Wildlife Service, "Facts about Federal Wildlife Laws," http://www.fws.gov/laws/facts.html.



IMPORTANT: THINGS TO REMEMBER ABOUT YOUR PASSPORT

1. It is unlawful for any person other than the named bearer to use this passport. Use of this passport in contravention of the conditions or restrictions set out in this passport, or for travel to countries where a U.S. passport is not valid is a felony. Title 18, U.S. Code, Section 1544. For further information, contact the nearest U.S. embassy or consulate or the Department of State, Office of Passport Policy, Planning and Legal Advisory Services, 202-955-0231.

2. U.S. Government Property. This passport is the property of the United States Government. Upon demand made by an authorized representative of the United States Government, it must be surrendered.

3. Loss, theft, or destruction of passport should be reported immediately to the police authorities and to Passport Services, Washington, D.C. 20520-4818, or overseas, to the nearest American embassy or consulate. Your passport is a valuable citizenship and identity document, which should be carefully safeguarded.

4. Alteration or mutilation of passport. This passport must not be altered or mutilated in any way. Alteration may make it INVALID, and, if willful, may subject you to prosecution (Title 18, U.S. Code, Section 1543). Only authorized officials of the United States or of foreign countries may place visas, remarks, notations, or additions in this passport. You may amend or update personal information for your own convenience on page 7.

PERSONAL DATA AND EMERGENCY CONTACT INFORMATION

FOR YOUR PROTECTION, IN PENCIL IN THE NAMES AND ADDRESSES
PLEASE KEEP THESE ENTRIES UP TO DATE.

BEARER'S ADDRESS IN THE UNITED STATES:
DIRECCION DEL PORTADOR EN LOS ESTADOS UNIDOS:

BEARER'S FOREIGN ADDRESS:
ADRESSE DU TITULAIRE A L'ETRANGER:
DIRECCION DEL PORTADOR EN EL EXTRANJERO:

IN CASE OF EMERGENCY, NOTIFY THE NEAREST AMERICAN EMBASSY, CONSULATE OR THE STATE DEPARTMENT OFFICE OF AMERICAN SERVICES AND CRISIS MANAGEMENT 202-647-5225, AND THE AGENCY CONTACT YOU NAME BELOW.

EN CAS D'URGENCE, PREVENIR L'AMBASSADE OU LE CONSULAT DES ETATS-UNIS LE PLUS PROCHE OU LE BUREAU DES CITOYENS AMERICAINS ET DE REPONSE AUX CRISES DU DEPARTEMENT D'ETAT AU 202-647-5225, AINSI QUE LA PERSONNE QUI VOUS DESIGNEZ CI-DESSOUS.

EN CASO DE EMERGENCIA, NOTIFIQUE A LA EMBAJADA O CONSULADO DE LOS ESTADOS UNIDOS MAS CERCANO, O AL CENTRO DE ENLACE PARA CIUDADANOS AMERICANOS Y GESTION DE CRISIS DEPARTAMENTO DE ESTADO, POR EL TELEFONO 202-647-5225, Y A LA PERSONA QUE NOMBRE EN E CONTINUACION.

Name
Nombre

Address
Direccion

Telephone
Telefono

● 活字体で記入して下さい。
● 折らないで下さい。
● カード②は出国時に入国審査官へ提出するものです。
* Please type or print.
* Do not fold.
* CARD ② is to be submitted to the Immigration Inspector at the time of your departure from Japan.

外国人用



●活字体で記入して下さい。
●折らないで下さい。
●カード②は出国時に入国審査官へ提出するものです。
* Please type or print.
* Do not fold.
* CARD② is to be submitted to the Immigration Inspector
  at the time of your departure from Japan.

外国人用















Amendments and Endorsements
Modifications et mentions spéciales
Enmiendas y Anotaciones



*Amendments and Endorsements*
*Modifications et mentions spéciales*
*Enmiendas y Anotaciones*